## No. 194.

### STATE *ex rel.* JURY COMMISSIONERS *v.* MAYOR AND ADMINISTRATORS OF THE CITY OF NEW ORLEANS.

1.  While courts must be slow to declare a statute unconstitutional, and should seek for interpretations which shall preserve such statute, yet to uphold the fundamental law and prevent its violation is a solemn judicial duty.
2.  Constitutions are interpreted according to the general rules of the law of interpretation, being in this respect upon the same footing as ordinary statutes, contracts, judgments, etc.
3.  In all such cases the aim should be to arrive at the *intent* of the law maker, the contractants, or the Judge, as the case may be.
4.  The principle first laid down in syllabus No. 1, means no more than that, in cases of doubt between two interpretations, either of which may be reasonably accepted, the courts will adopt the validating interpretation.
5.  In determining, under Art. 48, Const. of La. of 1879, whether an act be *local* or *special*, we should not confound in meaning these particular terms named, with the terms *general* and *public*, on the one hand, and *special* and *private* on the other.
6.  The word *local*, as used in Const. Art. 48, is not synonymous to either of the words *private* or *special*.
7.  The question whether a statute be *local* or *general* is a question of *place* only.
8.  Courts of Justice, when interpreting, must give, if possible, effect to every word.
9.  The fact that a statute applies to matters of public concern does not necessarily prevent such statute from being *local*, within the meaning of Art. 48.
10. The motives or intent of the Constitutional Convention given, in adopting Arts. 46 and 48.
11. The Act No. 117 of 1882, increasing the salaries of the Jury Commissioners for this Parish, is *local*, within the meaning of Art. 48, Constitution of La., and not having been published in accordance with the provisions of Art. 48, it is null.

*Appeal from Civil District Court, Division D.　Rightor, J.*

*Alexander Walker* for relators.

*C. F. Buck* and *Wynne Rogers*, City Attorneys, for respondents, appellants.

McGLOIN, J.—Relators, John L. Lewis, Paul Waterman and L. Placide Canonge, constitute the Board of Jury Commissioners for this parish; said board being created by Act No. 98 of 1880, and its duty being to draw and furnish the names of jurymen who are to serve in the various District Courts of this parish. By the

said Act, each of said Commissioners was entitled to compensation at the rate of fifty dollars per month. The Act, No. 117 of 1882, increasing the salary of relators, and upon which they rely in this action in order to compel respondents to budget and pay their claim for such salary at the increased rate, is short and as follows:

" Be it enacted by the General Assembly of the State of Louisiana, that section 2, of Act No. 98 of the session of 1880, be so amended as to read as follows, to-wit:

" That each of the Jury Commissioners created by said Act shall receive a salary of twelve hundred dollars per annum, payable monthly by the City of New Orleans."

Article 48, of the Constitution of 1879, is as follows:

" No local or special law shall be passed on any subject not enumerated in Article 46 of this Constitution, unless notice of the intention to apply therefor shall have been published, without cost to the State, in the locality where the matter or thing to be affected may be situated, which notice shall state the substance of the contemplated law, and shall be published at least thirty days prior to the introduction into the General Assembly of such bill, and in the same manner provided by law for the advertisement of judicial sales. The evidence of such notice having been published shall be exhibited in the General Assembly before such Act shall be passed, and every such Act shall contain a recital that such notice has been given."

The Act in question contains no recital of publication, and it is conceded that publication was not made.

Respondents aver that this Act is special and local, and hence within the purview of this constitutional prohibition, and so absolutely null and void.

The relators seek to meet this objection by advancing the following propositions:

1st. That the Courts must be slow to declare a law void for unconstitutionality; that they must seek, if possible, an interpretation of a constitutional clause, which will preserve, rather than one which will destroy it. In support of this is cited,

1 Bouvier, 337 ; 3 Den. N. Y. 381 ; 1 Cowen, N. Y. 550, 556 ; 20 La. An. 587 ; 3 Martin La. 12 ; 4 Martin La. N. S. 138 ; 5 Rob. La. 383 ; 8 La. An. 441 ; 9 La. An. 562.

2d.   That the Board of Jury Commissioners constitutes a portion of the machinery of the political government of the State, contributing to the efficient working of certain of its Courts of Record, before which Courts the citizens of every section of the State may appear in order to enforce their rights, and which protect the persons and property of all, resident or stranger, who may be found within the limits of their jurisdiction ; that hence, statutes regulating the duties, etc., of said board are of interest to the entire people of the State, and cannot be considered as either local or special.

### I.

We recognize the force in general of the first proposition laid down by the relators ; but, at the same time, we are aware that this rule has its limit.   The Constitution is the highest law of the State, and it calls with particular emphasis for recognition and obedience.   While respecting fully the dignity and authority of the legislative department, the judiciary must, at the same time, remember that it has upon it the solemn duty of upholding, within its sphere, the fundamental law, and of seeing that its provisions are not violated directly or indirectly.   We understand the rule to be, that, in interpreting Constitutional legislation, the Courts must be governed by the general principles which, applicable in all endeavors at interpretation, whether the thing to be interpreted be a contract, a judgment or a statute. 13 La. An. 345.

The cardinal principle is, that in all such cases the *intent* is what must be sought for, and which, when found, must be enforced.   In seeking for this *intent*, certain rules are available, but none of these rules can be employed for the purpose of defeating the *intent*, or, in other words, of repealing or altering the scope or effect, either of the judgment, contract or statute.

The principle laid down by the relators in their first proposition therefore, when properly restricted, means only that in cases

of doubt, and, as between two interpretations, either of which may be reasonably accepted, the courts will adopt the one which maintains the questioned statute, or, in other words, the one which does not impeach the legislative wisdom, and which the less circumscribes the legislative power.

## II.

In seeking the intent of the framers of the Constitution, as the same is embodied in Art. 48 of that instrument, we have come to the conclusion that the Act 117 of 1882, is one which comes within its purview. In solving this question we have striven to find the meanings which were sought to be conveyed by the word "*special*" and by the word "*local*," as these have been employed in this constitutional provision. We may well question the propriety, in the particular connection under consideration, of confounding entirely the words "*general*" and "*public*," on the one hand, and the words "*special*" and "*private*," on the other. We say *in this connection*, because this confusion grew up originally out of the mere application of the rule of evidence, which obtains on the case of proving statutes before Courts of Justice; those of one class having to be affirmatively established, and those of the other being noticed by all judicial tribunals, without proof. In considering such a question, nicety of distinction in the use of terms was not so essential, but where it becomes a matter of placing limits to the legislative or other power, as it has come to be under recent American Constitutions, a greater strictness should prevail.

It is, however, upon the meaning of the word *local* that we prefer to rest our decision. This certainly is not the synonym of *private*.

Webster defines the word *local* as follows:

" 1st. Pertaining to a place, or to a fixed or limited portion of space. We say the *local* situation of the house is pleasant. We are often influenced in our opinions by *local* circumstances.

" 2d. Limited or confined to a spot, place or definite district; as

a *local* custom. The yellow fever is *local* in its origin, and often continues for a time to be a *local* disease.

"3d. In law, *local* actions are such as must be brought in a particular county where the cause arises, distinguished from transitory actions. Blackstone."

Under none of these definitions can this word *local* be held to be the same, in meaning, as either of the words "private" or "special." Taking definition No. 2, we find it particularly applicable; and, in fact, the distinguished lexicographer might well have used, in the example given, the word *law* instead of *custom.* Therefore, whether the statute, or other thing, be *local* or *general*, has nothing to do with *persons*, but with *place* only; and it would be as reasonable to argue that, because the yellow fever has in fact a partiality for the strangers within its reach, rather than for residents, it cannot be a *local* disease, as to contend that laws regulating the particular concerns of this parish are not local, because strangers coming within the limits thereof are, during their stay, governed thereby.

The framers of the Constitution seem to have been careful in the verbiage of this Article, and they have excluded the idea of synonomy between the words "special" and "local," as these are made use of, for we find them disjoined by the conjunction "or."

If the word "*special*," be taken as the equivalent of "private," or rather as the opposite of "general," so far as this latter term applies to subject and not to place, then it alone expresses the restriction as the same is contended for by relators. When, however, the Convention added "*local*," disjoined from "*special*," it certainly intended to convey, by the addition, a separate, distinct and independent idea, and Courts of Justice are bound to give effect to every word as it is written, where this is at all possible, for they should presume that every such word was rightly used and had a purpose. Under the circumstances, certainly, even if we could at all do so, we cannot hold that *special* and *local*, both expressed but one and the same idea, and that we have here only a piece of useless and stupid repetition.

But if we admit this to be a case of doubt, and, as directed by

La. C. C., Art. 17, we turn to other Articles of the Constitution bearing upon this subject, and which are in *pari materia*, we are rewarded, as it were, by a flood of light.

Art. 46 of that Constitution has this opening :

" The General Assembly shall not pass any *local* or *special* law on the following specified objects : " etc.

After this comes a list of subjects, among which we may men-tion the following :

" For the opening and conducting of elections, or fixing or changing the places of voting."

"Changing the venue in civil or criminal cases."

" Authorizing the laying out, opening, closing, altering or main-taining roads, highways, streets or alleys, or relating to ferries and bridges, or incorporating bridge or ferry companies, except for the erection of bridges crossing streams which form bounda-ries between this and any other State."

" Remitting fines, penalties, and forfeitures, or refund moneys legally paid into the treasury."

" Authorizing the construction of street passenger railroads in any incorporated town or city."

" Regulating labor, trade, manufacturing or agriculture."

" Creating corporations, or amending, renewing, extending, or explaining the charter thereof; *provided,* this shall not apply to the corporation of the City of New Orleans, or to the organization of levee districts and parishes."

"Extending the time for the assessment or collection of taxes, or for the relief of any assessor or collector of taxes from the due performance of his duties, or of his securities from liability ; nor shall any such be passed by any political corporation of this State."

" Regulating the practice or jurisdiction of any court, or changing the rules of evidence in any judicial proceeding or en-quiry before courts, or providing or changing methods for the collection of debts, or prescribing the effects of judicial sales."

" Exemption of property from taxation."

" Fixing the rate of interest."

" Concerning any civil or criminal actions."

" Regulating the management of public schools, the building or repairing of schoolhouses, and the raising of money for such purposes."

" Legalizing the unauthorized or invalid acts of any officer, servant, agent of the State, or of any parish or municipality thereof."

The subjects here selected form by far the greater portion of all that are enumerated in Article 46, and yet they relate, every one of them, to matters of *public* concern, and many of them far more clearly so than the mere question of an increase of salary to the Jury Commissioners of this parish. And yet, the framers of the Constitution of 1879 evidently considered that, despite their being of *public interest*, legislation upon them might be " *local* or *special.*"

If, turning to Article 18 of the Civil Code of this State, we seek there one rule of interpretation, and strive to ascertain the "reason and spirit of it (the law), or the cause which induced the legislature to enact it," we must arrive at the same conclusion.

The purpose of the Convention, in adopting Article 46, was to render effective certain radical changes from former Constitutional legislation which had been made in the provisions creating and governing the Legislative Department. That Convention was a body elected by a people that had been suffering long from high taxation, resulting from the lavish expenditures, in times that had gone before, of the public moneys. The members assembled with the determination of reducing the tax burthens, and to accomplish this, they were compelled, of course, to direct their efforts to the task of reducing the governmental expenses. Hence, we find a reduction in the number of the public offices, and a wholesale reduction of official salaries. It was found, however, that the Legislative Department was a great consumer of public money, which went legitimately for pay of members, employes, for printing, stationery, etc. By providing that the regular legislative sessions should be biennial, instead of annual, as they

had been before, the item of legislative expenses was reduced one-half. Carrying on the work of reform still further, they restricted the length of all regular sessions, except the first, (Art. 21) to sixty days; and by this means a further reduction was secured.

Having thus attempted economy by curtailing the time to be devoted to legislation, they thereby rendered the time that had been actually given, itself precious, and a matter to be guarded against all wastefulness. It would have been poor wisdom, in order alone to save money, to have allowed too short a period for necessary legislation. Therefore, the question of economizing every moment of these sixty days in every two years became important.

Experience had taught them that it was the *private* or *special* bills, with the *local* ones which crowded the legislative calendars and consumed the legislative time; and they felt that if no restriction were placed upon the introduction of such bills, these latter would possibly consume all or a greater portion of the short period allowed, to the exclusion of general legislation; or, at best, that special or local bills would so distract and overwhelm the members, that general legislation would suffer by not receiving due consideration and thought. They considered that in the great majority of cases, general legislation could be made to apply, and hence selected the twenty-one subjects enumerated, and excluded upon these all special or local legislation. In view of such considerations, it becomes clear that the danger to be guarded against, was one more apt to arise in connection with bills in which there was a general public or interest,than with those in which there was only a particular or individual concern. Hence it is, that among the subjects upon the list, the great majority are those of a *public nature*, though not necessarily of a *general one*.

In the enactment of Article 48, there was, in addition to this one, another purpose. It was complained of, that, in the past, it had been not uncommon for particular citizens of certain localities to appear before the Legislature, either with or without the conni-

vance of the members representing their localities, and secure legislation affecting particular parishes, towns or neighborhoods, without its being known to the body of their neighbors that such legislation was to be applied for; or, at all events, without a fair opportunity for full discussion and presentation through the press and before the Legislature itself of all interests concerned. Thus, it was said, that the people went to sleep in a parish or town, to awake next morning finding promulgated the sundering of their old parish, or a change of the county seat, or the closing of a road or stream, etc., to which alterations they might have been opposed. To avoid this, and in order to afford fair warning in such cases, the Article 48 was adopted, requiring due publication in the localities to be affected, of local or special laws, so that the opposition if any there was to a proposed measure, might be notified and allowed to defend its interests or views, as it considered best.

In view of these facts, it was surely not statutes simply incorporating some village fire company, or establishing a rural literary society that were to be dreaded and to be guarded against with such jealous care.

Clauses somewhat similar to those under consideration are to be found in the Constitutions of some of our sister States. In discussing the decisions in Wisconsin and New York under such provisions, Mr. Sedgwick, in his work on the Construction of Statutory and Constitutional Law, (Ed. 1874, pp. 528, 529, note) has the following :

" It is settled, that if the statute be either *local* or *private*, the requirement as to title applies ; that is, if *the Act be local as to territory, no matter how public it may be in its character, it can contain but one subject,*" etc.

So, in note *A* to pages 534, 535, of the same work, we find other authorities to the same effect, among which the following :

"A Statute providing for the compensation of county officers has been held *local.* State vs. The Judges, 21 Ohio, N. S., 1."

" An Act regulating the fees of an officer was held not to be *general.* Ryan vs. Johnson, 5 Cal. 86, and see Henry vs. Henry, 13 Ind. 250."

Our attention is called to a number of statutes passed during the session of 1882, which, it is claimed, will be affected by a decision upon this issue adverse to the particular statute under consideration. Had the question not been forced upon us so squarely as to be beyond fair avoidance, we might have abstained from expressing the views here given forth. As it is, however, we are sworn officers of the State, with certain duties to perform, and these we must accomplish according to our consciences, and regardless of consequences. We do not say that there are other statutes so affected, for we have no right now to consider, much less to determine such a question, but even if so it were, the greater and more universal the violation of the Constitution, the more certain and emphatic becomes the duty of the judiciary to speak forth in its vindication.

Judgment reversed and application for a mandamus dismissed; relators to pay all costs.